*726
 
 KELLUM, Judge.
 

 The appellant, Raymond Charles Styron, was indicted in September 2006 by a Baldwin County grand jury for committing the following alleged criminal acts against R.D.A.,
 
 [1]
 
 a child under 12 years of age: three counts of sodomy in the first degree, a violation of § 13A-6-63(a)(3), Ala.Code 1975; two counts of sexual abuse in the first degree, a violation of § 13A-6-66(a)(1), Ala.Code 1975; and one count of sexual torture, a violation of § 13A-6-65.1(a)(1) or (3), Ala.Code 1975. Styron was also indicted in September 2006 for committing the following acts against E.A., a child less than 12 years of age: two counts of sodomy in the first degree, a violation of § 13A-6-63(a)(3), Ala.Code 1975; two counts of sexual abuse in the first degree, a violation of § 13A-6-66(a)(3), Ala.Code 1975; one count of rape in the first degree, a violation of § 13A-6-61(a)(1), Ala.Code 1975; and one count of sexual torture, a violation of § 13A-6-65.1(a)(1) or (3), Ala.Code 1975.
 

 Following a trial, the jury found Styron guilty of all counts alleged in the indictments. On the convictions for the offenses committed against R.D.A., the circuit court sentenced Styron to life imprisonment for each conviction of first-degree sodomy and sexual torture. Styron was sentenced to 10 years’ imprisonment for each conviction for first-degree sexual abuse. Regarding the convictions for the offenses committed against E.A., the circuit court sentenced Styron to life imprisonment for the first-degree sodomy convictions, rape conviction, and sexual-torture conviction. Styron was sentenced to 10 years’ imprisonment for each sexual-abuse-in-the-first-degree conviction. In both cases, the circuit court directed that the sentences run concurrently with the first life sentence imposed. The court further ordered Styron to pay a $500 fine for each conviction, $100 to the crime victims compensation fund for each conviction, and a total of $2,868.25 in restitution.
 

 The evidence presented at trial established the following pertinent facts. R.D.A. and E.A. are first cousins. E.J.A. is R.D.A. and E.A.’s aunt. R.D.A. and E.A. were close to E.J.A.’s family and would frequently see each other, spend the night together at the family’s home, and go to the beach together. R.D.A. and E.A., who were eight years old at the time of the alleged abuse, lived with EA.’s mother and stepfather, Styron, and stepbrother, D.S., at the home of their grandparents, J.A. and G.A. Styron and his wife lived in a storage building attached to the grandparents’ house.
 

 On the evening of June 24, 2006, E.J.A. was driving her children, D.A. and M.A., along with E.A. and R.D.A. home; E.A. and R.D.A. were sitting in the backseat of the vehicle with M.A. As she was driving, E.J.A. heard R.D.A. “laughing” and telling the others that Styron “has a generator that he used on my body. It’s supposed to massage my body.” (R. 152.) E.J.A. then asked R.DA. and E.A. where Styron used the “generator.” R.D.A. stated that Styron used it on “his head, his neck, and his private” and that Styron had “stuck it up his butt that morning.” (R. 154.) R.D.A. told E.J.A. that Styron had used the “generator” on him several times. R.D.A. further told E.J.A. that the activity occurred once a month. E.A. told E.J.A. that Styron used the “generator” “in the same area, in the private.” (R. 154.) R.D.A. and E.A. both told E.J.A. that Styron had
 
 *727
 
 touched his mouth to their respective “privates.” R.D.A. and E.A. told E.J.A. that the molestation had happened in the storage building attached to G.A.’s and J.A.’s house. E.J.A. testified that she immediately telephoned G.A. and J.A. and told them to come to her house. After discussing the matter with G.A. and J.A., they contacted local law enforcement.
 

 Tony Nolfe, a sergeant with the Baldwin County Sheriffs Department and the supervisor of the unit that investigates sex offenses against children, met with E.J.A., G.A., and J.A. at approximately 11:00 p.m. on June 24, 2006. Sgt. Nolfe briefly spoke with E.J.A. regarding the manner in which the children disclosed the abuse before going to Styron’s residence to question him. Sgt. Nolfe explained that he wanted to question Styron immediately because another child was in the house with Styron. Once at Styron’s residence, Sgt. Nolfe informed Styron of his Miranda
 
 [2]
 
 rights, and Styron voluntarily waived those rights. Styron also voluntarily consented to the search of the residence. Sgt. Nolfe then performed a cursory search of the residence, where he found in plain view “the vibrator in question sitting on the bedside table where it had been described by one of the children that it should be, or where it should be. And it matched the description.” (R. 182.)
 

 After determining that there had been a valid disclosure, Sgt. Nolfe, along with Deputy Lee Paul, interviewed Styron for several hours. Before beginning the interview, Sgt. Nolfe reasserted Styron’s
 
 Miranda
 
 rights. Sgt. Nolfe testified that he then told Styron that the officers were there “because the secret was out, that the kids had told their secret.” (R. 191.) Sgt. Nolfe testified that after hearing this, Styron became even more nervous than he had been earlier. When Sgt. Nolfe informed Styron of the children’s statements and his belief that those statements were true, Styron denied them. However, shortly after denying any wrongdoing, Styron admitted to “many, many of these things that he is accused of doing.” (R. 195.)
 

 Approximately two hours into the interview, Styron admitted that he had molested the children. Sgt. Nolfe testified:
 

 “[Styron] said that he was sorry, that he did love them and he did not want to hurt them, and that he wanted to do whatever he could do to make sure that they were okay mentally, that he would, he would help make sure that they were okay because that was something that was important to him, he said.
 

 “He went on to tell me that if they ever said it hurt he would stop. ‘They knew that if I hurt them, they could tell me to stop.’ And that was sort of the dam-breaking sort of statement that opened up the subsequent statements.”
 

 (R. 195-96.)
 

 Styron explained to Sgt. Nolfe that the abuse of the children arose from his “curiosity” and physical excitement. Sgt. Nolfe testified:
 

 “I did ask him about — it’s a standard question — about his sex life with his wife and what led, you know, why would this have gotten started with the children? He said that [he and his wife] had a normal sex life and that it got started with the children just out of curiosity, or they would be playing around or wrestling and that he would become physically excited and one thing would lead to another.
 

 [[Image here]]
 

 “... [H]e said that he did not know how the sexual stuff started with the
 
 *728
 
 kids other than just being a progressive thing, to paraphrase.”
 

 (R. 197.)
 

 Styron told Sgt. Nolfe that the molestation of the children started approximately one year ago, after the children moved into the storage building and only occurred when his wife was not at home. Styron informed Sgt. Nolfe that it would only rarely be just him and R.D.A., but would frequently be just him and E.A., and then occasionally all three of them together. Sometimes Styron and the children would be clothed and sometimes they would be nude or in some state of disrobe.
 

 Styron described in detail to Sgt. Nolfe his molestation of E.A. Styron referred to the sexual acts committed as “playing.” (R. 205.) Styron estimated that he had performed oral sex on E.A. approximately 20 times. Styron made E.A. manually stimulate his penis several times. Sgt. Nolfe testified that Styron
 

 “stated that he only had [E.A.] masturbate him or fondle him on several occasions, several times, but said that he made sure — he was very adamant, strangely — that he never ejaculated on her, that she didn’t like that and thought it was gross. And he went on to say that she wouldn’t perform oral sex on him for the same reason, that she thought it was gross, and he wouldn’t make her do anything that she didn’t want to do, is what he told me.”
 

 (R. 202.) However, Styron later admitted to Sgt. Nolfe that he had had E.A. manually stimulate him to orgasm just “the day before yesterday.” (R. 205.) Styron claimed that he did not have sexual intercourse with E.A. because he “would tear her apart” and “hurt her.” (R. 203.) However, Styron admitted to inserting his penis into E.A.’s vagina. Sgt. Nolfe testified:
 

 “[Styron] said that he would sort of kneel between [E.A.’s] legs or have her on the side of the bed and the he would rub himself around, I guess, just inside her vaginal area or between the labia, and that he would do that to the point of ejaculation, and just kind of push against her a little bit but never in her.”
 

 (R. 203.) Styron further described to Sgt. Nolfe how he had penetrated E.A.’s vagina with a vibrator once and penetrated E.A.’s vagina with his pinky finger.
 

 Styron also admitted to the molestation of R.D.A. Styron told Sgt. Nolfe that he inserted a vibrator into R.D.A.’s anus in E.A.’s presence. Styron told Sgt. Nolfe that as recently as the morning of June 24, 2006, he had asked R.D.A. “if he could get his noodle hard, and asked him if he would try to get his noodle hard.” (R. 205.) Styron referred to his penis as a “noodle.” Styron described to Sgt. Nolfe how he and R.D.A. would often “play with each other until they were erect, and that that happened a lot.” (R. 208.) Styron further stated that he had performed oral sex on R.D.A. approximately three times and that he had R.D.A. perform oral sex on him approximately three times. Styron described the molestation of the children as “something special.” (R. 208.)
 

 Tammy Burns, a social worker with the Alabama Department of Human Resources who specialized in responding to reports of child sexual and physical abuse, arranged to interview the children shortly after learning about the allegations of sexual abuse. On June 28, 2006, Burns interviewed E.A. and R.D.A., who arrived for the interview with only their families, outside the presence of law enforcement. Burns testified that E.A. told her that Styron was her stepfather. E.A. described to Burns numerous incidents of sexual contact that had occurred in the bedroom shared by Styron and E.A.’s
 
 *729
 
 mother, R.S. E.A. told Burns that Styron “touched [her] front private with his front private, and hurt, put it inside.” (R. 268.) E.A. described to Burns “penile/vaginal penetration” and “penile/rectal penetration.” (R. 272.) E.A. described how Styron put his mouth on her vagina, touched her vagina with his hand, and touched her vagina with his penis. E.A. further told Burns that Styron digitally penetrated her vagina, inserted his finger and penis into her rectum, and penetrated her vagina and rectum with a vibrator. E.A. also described to Burns how Styron made her rub his penis with her hand. Burns testified that E.A. told her that Styron forced her and R.D.A. to engage in sexual acts with each other while he watched and that she had been with R.D.A. when Styron molested him. E.A. explained to Burns that Styron rewarded her with gifts for keeping their “secret.” (R. 273.)
 

 R.D.A., who was 10 years old at the time of trial, testified that during the time that he lived with Styron, E.A., and E.A.’s mother, Styron touched his “front private part” with his mouth and made him touch Styron’s erect “front private part.” (R. 113, 116.) Styron also put his penis into R.D.A.’s mouth. R.D.A. further testified that Styron took a white vibrator and “put it up my butt.” (R. 118.) Styron told R.D.A. that he was going to “suck [R.D.A.’s] noodle,” and, after doing so, he would tell R.D.A. that it was his turn to reciprocate. (R. 120.)
 

 R.D.A. testified that he would sometimes be in a bedroom with Styron and E.A. R.D.A. described watching Styron touch E.A.’s “front private part.” R.D.A. testified that he also saw Styron touch and place his mouth on E.A.’s “front private part” and also saw Styron insert his penis into her body. (R. 121.) According to R.D.A., Styron used his cellular telephone to photograph him with R.D.A. and E.A. while engaging in sexual activities. Styron told R.D.A. and E.A. that they could not tell anyone about what he had done to them.
 

 Dr. Raymon Peterson, a medical doctor who regularly examines children for possible indications of sexual abuse, examined E.A. and R.D.A. in a special examination room at Thomas Hospital. Dr. Peterson testified that one seldom finds during an examination physical indications of sexual abuse in children. However, Dr. Peterson testified that his examination of E.A. revealed small hematomas and two small bruises at the base of her hymen “on the forward part of the vagina.” (R. 243.) Dr. Peterson stated that the bruises contained bright red blood, which indicated that they were recent. E.A. also had two small fissures in her rectum, but Dr. Peterson explained that such fissures were commonly found in normal children who have large bowel movements. Dr. Peterson concluded that the bruises and hema-toma stemmed from “some kind of trauma.” (R. 245.)
 

 Dr. Peterson testified that he examined R.D.A.’s rectum and determined that it was normal. However, Dr. Peterson noted that it was uncommon to find any damage in the area of the sphincter or the anus. Dr. Peterson found that R.D.A.’s genitalia were also normal.
 

 Styron’s defense counsel rested without putting on any evidence. After both sides had rested and the court instructed the jury on the law applicable to Styron’s case, the jury found Styron guilty of all charges set out in the indictments. This appeal followed.
 

 Styron’s sole contention on appeal is that the circuit court erred in admitting, over his objection, the testimony of E.J.A. and Burns because, he argues, their testimony violated his rights under the Con
 
 *730
 
 frontation Clause and the United States Supreme Court’s decision in
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Specifically, Styron contends that E.A.’s out-of-court descriptions to E.J.A. and Burns of her sexual molestation constituted “testimonial” statements under
 
 Crawford
 
 and that their admission into evidence without allowing Styron to cross-examine E.A. “tainted” his convictions in the cases of both E.A. and R.D.A.; Styron maintains that this error was not harmless. In the alternative, Styron argues that his convictions for the offenses committed against E.A. should be reversed.
 

 The record indicates that at the conclusion of R.D.A.’s testimony, the State called E.A., who was nine years old at the time of trial, to testify. After asking E.A. several questions in the presence of the jury and receiving no response, the circuit court determined that E.A. had “just completely frozen up.” (R. 135.) Out of the presence of the jury, the circuit court further questioned E.A. and received no oral response. Defense counsel then moved to disqualify E.A. as a witness based on her inability to testify and his doubt that she would respond to cross-examination. The State then moved to admit E.A.’s out-of-court statements. The circuit court granted the State’s motion, finding:
 

 “Well, it appears to the Court from its attempts on two separate occasions, before and after the break, to talk to the child, that the child is unavailable to testify because of the child’s inability to communicate about the offense because of fear or a similar reason. And obviously the Court is not a child psychologist and I don’t know why [E.A.] is choosing not to speak, but I think she said she was nine. I think that was the only thing that she said.
 

 [[Image here]]
 

 “That’s the only thing I recall [E.A.] saying. And in response to one of [the prosecutor’s] questions about, do you know the difference between telling the truth or telling a lie, she nodded her head up and down. And that’s been the extent of her ability to communicate. So the Court will grant the State’s request to use out-of-court statements on behalf of [E.A.].”
 

 (R. 143-44.)
 

 In
 
 Crawford v. Washington,
 
 supra, the United States Supreme Court held that the admission of a wife’s out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the Confrontation Clause. The Supreme Court stated that, regardless of whether an out-of-court statement is deemed reliable by the trial court, an out-of-court statement by a witness that is testimonial is barred under the Sixth Amendment’s Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.
 
 Crawford v. Washington,
 
 541 U.S. at 68, 124 S.Ct. 1354. Although the Supreme Court held that
 
 Crawford
 
 applied to testimonial statements, it declined to provide a comprehensive definition of testimonial statements, stating merely that “[whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.” 541 U.S. at 68, 124 S.Ct. 1354.
 

 In
 
 Davis v. Washington,
 
 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the United States Supreme Court expounded on what types of statements were testimonial statements:
 

 “Statements are nontestimonial- when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the
 
 *731
 
 interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.”
 

 547 U.S. at 822, 126 S.Ct. 2266.
 

 Alabama law authorizes the admission of an out-of-court statement made by a child under the age of 12 under certain circumstances. See § 15-25-81, Ala.Code 1975. Section 15-25-32, Ala.Code 1975, provides:
 

 “An out-of-court statement may be admitted as provided in Section 15-25-31, if:
 

 “(1) The child testifies at the proceeding, or testifies by means of video tape deposition as provided by Section 15-25-2, or testifies by means of closed circuit television as is provided in Section 15-25-3, and at the time of such testimony is subject to cross-examination about the out-of-court statements; or
 

 “(2)a. The child is found by the court to be unavailable to testify on any of these grounds:
 

 “1. The child’s death;
 

 “2. The court finds that there are reasonable grounds to believe that the defendant or someone acting on behalf of the defendant has intentionally removed the child from the jurisdiction of the court;
 

 “3. The child’s total failure of memory;
 

 “4. The child’s physical or mental disability;
 

 “5. The child’s incompetency, including the child’s inability to communicate about the offense because of fear or a similar reason; or
 

 “6. Substantial likelihood that the child would suffer severe emotional trauma from testifying at the proceeding or by means of closed circuit television; and
 

 “b. The child’s out-of-court statement is shown to the reasonable satisfaction of the court to possess particularized guarantees of trustworthiness.”
 

 Although the United States Supreme Court’s decision in
 
 Crawford
 
 effectively abrogated subsection b. of § 15-25-32(2), § 15-25-32 still requires the declarant’s unavailability in order to admit an out-of-court statement made by a child under the age of 12.
 

 Statements to E.J.A.
 

 It is undisputed that E.A. was unable to communicate at trial about the offense. After several attempts to get E.A. to respond to questioning, defense counsel moved to disqualify E.A. as a witness based on her inability to testify and counsel’s doubt that she would respond to cross-examination. Styron does not question on appeal E.A.’s unavailability to testify. Therefore, a detailed discussion of the applicability of § 15-25-31 is unnecessary in this case.
 

 The record indicates that the statements made by E.A. and R.D.A. while riding in E.J.A.’s vehicle were spontaneous statements made outside the scope of a police interrogation. While taking E.A. and R.D.A. home, E.J.A. overheard the children laughing and discussing a “generator” being used on their bodies and on their “private[s].” The comments made by E.A. and R.D.A. prompted E.J.A. to question the children further and ultimately led to the discovery that Styron had sexually molested E.A. and R.D.A. At the time E.J.A. questioned the children, she clearly did so out of concern for the children in
 
 *732
 
 her role as the children’s aunt and not in contemplation of a criminal investigation or trial. Accordingly, the statements E.A. and R.D.A. made to E.J.A. were nontesti-monial under
 
 Crawford.
 
 Spontaneous utterances and responses to inquiries by family members under the circumstances of the instant case do not bear the indicia of “formal statements] to government officers,” but are instead more analogous to “a casual remark to an acquaintance.”
 
 Crawford,
 
 541 U.S. at 51, 124 S.Ct. 1354. Therefore, the circuit court did not err in admitting E.J.A.’s testimony regarding E.A.’s out-of-court statements pursuant to § 15-25-31.
 

 Statements to Bums
 

 Regarding statements by E.A. and R.D.A. to Burns, the record establishes that after E.J.A. discovered that the children had been molested, law-enforcement officers were called to investigate the children’s claims. After briefly questioning E.J.A., Sgt. Nolfe went to Styron’s residence to question him. Within hours of initiating his questioning of Styron, Styron confessed to molesting E.A. and R.D.A. Burns, a DHR employee, was immediately notified about the allegations of molestation and arranged to interview E.A. and R.D.A. Four days after E.A. and R.D.A. reported the molestation by Styron, Burns interviewed the children at a local hospital outside the presence of law-enforcement officers.
 

 Burns interviewed the children in her capacity as an employee of DHR specializing in child sexual-abuse claims. At the time Burns interviewed E.A. and R.D.A., a criminal investigation into the claims against Styron was well underway. The State contends that the evidence established that the “primary purpose” of Burns’s interaction with the children was not to further a criminal investigation, but instead was to assist the children in obtaining treatment for any damage, physical or otherwise, that might have stemmed from the alleged abuse. Although the evidence does support the State’s contention insofar as Burns was charged with attending to E.A.’s and R.D.A.’s mental and physical well-being in the aftermath of the allegations of molestation, the evidence also indicates that Burns was the first government employee to interview the children regarding the molestation allegations. Sgt. Nolfe spoke with E.J.A., but did not speak with the children. Certainly, statements made to Burns might be used to corroborate the statements made by the children to E.J.A. Under the circumstances of the instant case, Burns’s interview with the children was closely tied to the continuing criminal investigation of the molestation of E.A. and R.D.A. Therefore, E.A.’s and R.D.A.’s statements to Burns fit within the scope of “testimonial” hearsay that
 
 Crawford v. Washington
 
 holds is subject to the Confrontation Clause. Accordingly, the circuit court erred when it allowed Burns to testify regarding E.A.’s statements that Styron committed improper sexual acts with her on several occasions.
 

 Harmless-Error Analysis
 

 Having concluded that the circuit court erred in admitting Burns’s testimony regarding E.A.’s statements, we must now determine whether the error warrants reversal. Rule 45, Ala. R.App. P., states:
 

 “No judgment may be reversed or set aside, nor a new trial granted in any ... criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, ... unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained
 
 *733
 
 of has probably injuriously affected substantial rights of the parties.”
 

 In
 
 T.P. v. State,
 
 911 So.2d 1117 (Ala.Crim.App.2004), this Court discussed the application of the harmless-error analysis to claims alleging a violation of the Confrontation Clause:
 

 “In determining whether the error in this case was harmless, we first look to the Supreme Court’s opinion in
 
 Crawford v.
 
 Washington[, 541 U.S. 36 (2004) ]. In remanding that ease to the Washington Supreme Court for further proceedings, it noted that the state appellate court had found the confrontation violation ‘not harmless.’ 541 U.S. at 42 n. 1, 124 S.Ct. at 1359 n. 1. From this, we infer that while
 
 Crawford v. Washington
 
 fundamentally alters the way we analyze claims of error under the Confrontation Clause, the opinion does not change the way we evaluate the effect of any such error. Accordingly, we must now determine whether the constitutional violation in this case is harmless beyond a reasonable doubt.
 
 Chapman v. California,
 
 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); see also
 
 Perkins v. State,
 
 897 So.2d [457,] 465 [ (Ala.Crim.App.2004) ];
 
 Smith v. State,
 
 898 So.2d [907,] 918 [ (Ala.Crim.App.2004) ].”
 

 911 So.2d at 1124.
 

 Excluding Burns’s testimony regarding E.A.’s statements to her, the State produced ample evidence on which to base a finding that Styron was guilty of multiple counts of sodomy in the first degree, sexual abuse in the first degree, sexual torture, and one count of rape in the first degree.
 

 “A person commits the crime of sodomy in the first degree if:
 

 [[Image here]]
 

 “(3) He, being 16 years old or older, engages in deviate sexual intercourse with a person who is less than 12 years old.”
 

 § 13A-6-63(a)(3), Ala.Code 1975. “Deviate sexual intercourse” is defined as “[a]ny act of sexual gratification between persons not married to each other involving the sex organs of one person and the mouth or anus of another.” § 13A-6-60(2), Ala. Code 1975.
 

 A person commits the crime of sexual torture “[b]y penetrating the vagina or anus or mouth of a person who is less than 12 years old with an inanimate object, by a person who is 16 years old or older with the intent to sexually torture or to sexually abuse.” § 13A-6-65.1(3), Ala.Code 1975. Rape in the first degree is defined, in pertinent part, as follows:
 

 “(a) A person commits the crime of rape in the first degree if:
 

 “(1) He or she engages in sexual intercourse with a member of the opposite sex by forcible compulsion.... ”
 

 § 13A-6-61(a)(l), Ala.Code 1975.
 

 Section 13A-6-66, Ala.Code 1975 — the sexual-abuse statute in effect at the time of the commission of the criminal offenses by Styron
 
 [3]
 
 — provided, in pertinent part, as follows:
 

 “(a) A person commits the crime of sexual abuse in the first degree if:
 

 “(1) He subjects another person to sexual contact by forcible compulsion; or
 

 
 *734
 
 [[Image here]]
 

 “(3) He, being 16 years old or older, subjects another person to sexual contact who is less than 12 years old.”
 

 “Sexual contact” is defined as “[a]ny touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party.” § 13A-6-60(3), Ala.Code 1975. This Court has previously held that “ ‘[a]ny touching of the sexual or other intimate parts’ should be construed literally to mean any touching, whether directly or using any inanimate object.”
 
 Gunter v. State,
 
 665 So.2d 1008, 1013 (Ala.Crim.App.1995). “Forcible compulsion” is defined as “[pjhysical force that overcomes earnest resistance or a threat, express or implied, that placed a person in fear of immediate death or serious physical injury to himself or another person.” § 13A-6-60(8), Ala.Code 1975. “[Fjorcible compulsion does not exist in a vacuum; rather it is viewed in light of the surrounding circumstances, such as the respective ages of the victim and the perpetrator, the relationship between them, the circumstances under which the act took place, and any injuries the victim suffered.”
 
 Ex parte Williford,
 
 931 So.2d 10, 14 (Ala.2005).
 

 At trial, R.D.A. testified that Styron performed oral sex on him, that he made R.D.A. touch his erect penis and perform oral sex, that he put his penis “near” R.D.A.’s rectum, and that he inserted a vibrator into his rectum. R.D.A. further testified that he witnessed Styron touch E.A.’s vagina, place his mouth on E.A.’s vagina, and insert his penis into E.A.’s body. R.D.A. stated that Styron photographed the children as they were engaging in sexual activity. An examination of E.A. by Dr. Peterson revealed physical evidence of molestation in the form of “quite recent” bruising at the base of EA.’s vagina. Dr. Peterson also discovered small hematomas and fissures in E.A.’s rectum. Dr. Peterson opined that the bruising and hematomas were evidence of some type of trauma.
 

 Styron admitted during a police interview to molesting the children. Over the course of a year, Styron engaged in sexual acts with the children that included oral sex, masturbation, and digital stimulation. Styron admitted that he had performed oral sex on E.A. on approximately 20 occasions; that he made her manually stimulate his penis several times; that he inserted his finger and a vibrator into E.A.’s vagina; and that he inserted his penis into E.A.’s vagina and “pushed against her.” (R. 203.) Styron also admitted to inserting a vibrator into R.D.A.’s anus. Styron informed police that he and R.D.A. had played with each other until both were erect and that he and R.D.A. had performed oral sex on one another.
 

 Based on our review of the record, it is “clear beyond a reasonable doubt that the jury would have returned a verdict of guilty” regardless of the circuit court’s failure exclude Burns’s testimony regarding statements E.A. made to her.
 
 Ex parte Greathouse,
 
 624 So.2d 208, 210 (Ala.1993). See also
 
 Chapman v. California,
 
 supra. Therefore, any error on the part of the circuit court was harmless.
 

 Furthermore, Styron’s contention on appeal that the admission into evidence of E.A.’s statements to E.J.A. and to Burns somehow “tainted” his convictions in the case involving R.D.A. is without merit. As discussed above, E.A.’s statements to E.J.A. were admissible; therefore, we must determine only whether the admission of E.A.’s statements to Burns “tainted” Styron’s conviction in the case of
 
 *735
 
 R.D.A. The record establishes that the circuit court limited Burns’s testimony to statements made by E.A. given R.D.A.’s availability to testify at trial. Further, R.D.A. testified in detail regarding the acts of sodomy, sexual abuse, and sexual torture committed by Styron. Accordingly, we find no evidence that the admission of EA’s statements to Burns “tainted” Styron’s conviction in the case of R.D.A.
 

 Based on the foregoing, the circuit court’s judgment is affirmed.
 

 AFFIRMED.
 

 WISE, P.J., and WELCH, WINDOM, and MAIN, JJ., concur.
 

 [1]
 

 . Initials are used throughout the opinion to protect the anonymity of the victim. See Rule 52, Ala. R.App. P.
 

 [2]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [3]
 

 . Effective July 1, 2006, the Alabama Legislature amended § 13A-6-66, deleted section (a)(3), and enacted § 13A-6-69.1, Ala.Code 1975, separately defining "the crime of sexual abuse of a child less than 12 years old.” It is well settled that the law in effect at the time of the commission of the offense controls the prosecution of the offense.
 
 M.H. v. State, 6
 
 So.3d 41 (Ala.Crim.App.2008);
 
 Minnifield v. State,
 
 941 So.2d 1000, 1001 (Ala.Crim.App.2005);
 
 Hardy v. State,
 
 570 So.2d 871 (Ala.Crim.App.1990).